178 N.J. Super. 417 (1981)
429 A.2d 397
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
THERESA MOORE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted March 17, 1981.
Decided April 3, 1981.
*420 Before Judges MATTHEWS, MORTON I. GREENBERG and J.H. COLEMAN.
Stanley C. Van Ness, Public Defender, attorney for appellant (Randall W. Westreich, designated counsel, of counsel, and on the brief).
John J. Degnan, Attorney General, attorney for respondent (John A. Covino, Deputy Attorney General, of counsel, and on the brief).
*421 PER CURIAM.
This is an appeal from a murder conviction in which defendant and her cofelon agreed to murder their mutual lover. Defendant's trial was severed from that of her cofelon. On May 10, 1979 defendant was convicted of murder of Arthur W. Ivery, conspiracy to commit murder and forgery of Ivery's signature on a credit card slip. On the same day the jury verdict was received, the judge imposed a life sentence to the Correctional Institution for Women at Clinton on the murder charge. The judge fixed May 25, 1979 as the sentencing date on the other convictions. After defendant had left the courtroom, her counsel informed the judge that defendant was already serving a sentence for parole violation. The judge immediately ordered defendant, her attorney, and the prosecutor be brought back to court. Upon the reconvening of court, defendant was advised that the court was reserving decision on whether to make the life sentence concurrent or consecutive to the sentence she was then serving. This appeal followed.
Defendant cites five errors:
I. The trial court's failure to charge the jury that the use of alcohol can operate to reduce the degree of culpability from first to second degree murder constitutes reversible error. (Not raised below.)
II. Defendant was denied her right to effective assistance of counsel.
III. The trial judge erred in instructing the jury with regard to defense of another.
IV. The court impermissibly gave defendant a consecutive sentence to her present sentence.
V. Defendant's sentence was excessive and manifestly should be reduced.
The evidence at trial revealed that on December 30, 1978 codefendant Albirtha Johnson picked up defendant at a bus station in Freehold. They drove to Johnson's home in Long Branch. Defendant and Johnson were lovers. Both Johnson and defendant also engaged in sexual relations with decedent. Johnson and decedent shared the same residence. Apparently this tempestuous arrangement often led to frequent physical fights between Ivery and the two women. Since defendant was a woman of no ordinary size  weighing approximately 250 *422 pounds and somewhat resembling a male, she was apparently able to overwhelm Ivery when they fought.
During the ride from Freehold to Johnson's house in Long Branch, Johnson told defendant that she wanted Ivery dead because "she didn't want him in her life any more." Defendant apparently did not reply to this statement.
Thereafter Johnson and defendant left to pick up Ivery from his job in Freehold. On the way, they stopped at a liquor store and bought a pint of vodka. They parked in a parking lot at about 1:30 p.m. and drank half the bottle. Then they drove to the nursing home where Ivery was employed and picked him up at about 1:55 p.m. Johnson told Ivery that she wanted to go to the Freehold Pond area.
Once they arrived at the pond, all three stood talking idly in front of a field. Johnson then drove all three to the bank of the pond. Ivery got out and said he was going to change a tire on the car. As he jacked up the car to change the tire Johnson got behind him and plunged a knife she had secreted in her purse, into the middle of his back. Apparently this caused only superficial wounds as Ivery was thereafter able to fight with Johnson for about five minutes. Before she stabbed him, and thereafter while they were fighting, Johnson kept motioning for defendant to join the fight. Defendant hesitated to join in and "had to go back to the car and get another drink to get my nerves back up." According to defendant, she joined in the fight because Ivery had Johnson on her back and was about to punch her, and defendant thought she had to act to protect Johnson from getting hurt. After taking the drink, defendant grabbed Ivery by the throat. Although she testified that she only intended to knock him out, she maintained her grip on Ivery's throat for about five to ten minutes until he was dead. Apparently Johnson was able to get off the ground at some point and thereafter attempted to stuff a wool hat into Ivery's month to keep him quiet.
*423 Defendant and Johnson put Ivery's body into the car and drove to Long Branch. They stopped at Bell Liquors in Long Branch between two and three o'clock, whereupon Johnson went into the store and attempted to use Ivery's Master Charge card. Martin Becker, the owner of the store, refused to allow her to use it because it was a man's card. Johnson left the store but reappeared a few minutes later with defendant who, Johnson told the store owner, was Arthur Ivery. Defendant displayed Ivery's credit card and signed his name on the credit card slip for goods having a total value of a little less than $50.
After leaving the liquor store defendant and Johnson took the body to a site near Ocean and Chelsea Avenues in Long Branch and dumped it behind an eight-foot tall fence located next to a water-slide amusement ride. Thereafter the two women returned to Johnson's house were defendant stayed a few days before returning to her parent's house in Englishtown.
Defendant first contends that under the facts of this case reversible error occurred due to the trial judge's failure to instruct the jury that if it believed defendant was sufficiently intoxicated at the time of the murder, to the extent that it rendered her incapable of deliberation and premeditation, they should find defendant guilty of second degree rather than first degree murder. We find defendant's argument is not persuasive.
Defendant did not request the judge to instruct the jury on intoxication and no objection was made on the failure to so instruct. The question before us, therefore, is whether the failure to so instruct constitutes plain error. R. 2:10-2. State v. Polk, 164 N.J. Super. 457, 462-463 (App.Div. 1977), aff'd o.b. 78 N.J. 539 (1979). The courts have generally held that a trial judge should charge intoxication, whether or not it is raised as a defense, if the evidence indicates that the issue should be presented for jury determination. See State v. Frankland, 51 N.J. 221, 223-224 (1968); State v. Ghaul, 132 N.J. Super. 438, 440-441 (App.Div. 1975). Failure to instruct in the proper circumstances *424 can result in reversible error. State v. Frankland, supra, 51 N.J. at 224. However, where the evidence of alcohol consumption does not rise to the level where a reasonable jury might find that defendant was sufficiently intoxicated to render him incapable of premeditation, a trial court should not mention this defense in its instructions. State v. Stasio, 78 N.J. 467, 483 (1979).
In State v. Ghaul, supra, for example, the court concluded that such an instruction was unwarranted where defendant's own testimony indicated that he could think clearly at the time the crime was committed and was able to describe the events that occurred without contending his memory was impaired. The facts in the instant case require a similar conclusion. As in Ghaul, supra, the record indicates defendant's almost total recall of the events preceding, during and following the murder. Furthermore, by defendant's own testimony, the two women purchased, at most, one pint of vodka prior to picking Ivery up at work. Between the two of them, they drank one-half of the pint bottle before picking Ivery up at work. Considering that defendant weighed well over 200 pounds and given the fact that the effect of alcohol depends on the size and weight of the individual, it appears extremely unlikely that the amount of alcohol consumed by defendant would render her incapable of forming an intent to kill. Furthermore, taken within the total circumstances of this case, alcohol played an almost insignificant role in the murder of Ivery. Defendant knew well before they purchased the alcohol that Johnson was serious about killing Ivery. She even stated that she would do the killing for Johnson. In addition, after they reached the Freehold Pond and after Johnson began fighting with Ivery, defendant testified that she "had to go back to the car to get another drink to get my nerves back up" before she joined in. These circumstances clearly suggest that defendant was not intoxicated to the point that an instruction by the court was warranted. In fact, it appears to be a logical inconsistency for defendant to claim that she was so intoxicated that she could not form an intent to kill *425 and on the other hand make the rational decision to take another drink because she was scared of what she was doing and had to get her "nerves back up."
Defendant also contends that she was deprived of effective assistance of counsel solely on the basis that her counsel should have raised the question of defendant's degree of intoxication during trial. This contention is meritless for the reasons previously stated.
Defendant further contends that the trial judge erred in his instructions concerning defense of another. In particular, she asserts that the judge failed to instruct the jury that whether reasonable force was used was to be determined by the subjective intent of the intervenor. This error occurred, defendant states, by the omission from the charge "that if [defendant] really did not believe Albirtha Johnson would go through with the killing, and that she was just trying to scare Ivery, but that after five minutes the fight was getting out of hand, the question was whether she was intervening at the time under a reasonable but mistaken belief she was protecting Ms. Johnson." Additionally, defendant claims reversible error in the judge's failure to instruct the jury that they were to use a subjective intent test for the issue of excessive force also. We also find these contentions lack merit.
When coming to the defense of another, the test for determining one's criminal responsibility has a very limited subjective component. The test was spelled out in State v. Fair, 45 N.J. 77 (1965):
... the test of whether of party may intervene in defense of a third person being determined by the subjective intent of the intervenor, subject only to the qualification that a jury objectively find that he reasonably arrived at the conclusion that the apparent victim was in peril, and that the force he used was necessary. Thus, the so-called "reasonable mistake of fact" doctrine is given its due, both as to the amount of force and the initial lawfulness of the intervention ... [at 92-93]
Thus it is clear that although New Jersey had rejected the rule that the right of one person to defend another is *426 co-extensive with the right of the other to defend himself, 45 N.J. at 92, the rule remains an objective test to the extent that justification for killing depends on the jury's determination of what it thinks a reasonable man would have done under the circumstances and not upon a subjective exploration of defendant's psyche. 45 N.J. at 92-93. See, also, State v. Bess, 53 N.J. 10, 16 (1968); Model Jury Charge  Criminal § 3.280.
In light of the legal standard stated above, the trial judge's instructions did not constitute reversible error. The instruction as a whole followed the mandate of State v. Fair, supra. Also, the judge properly instructed the jury on the burden of proof on the issue of defense of another.
On May 10, 1979, following a verdict of guilty to first degree murder, the court imposed a life sentence on that count and fixed May 25 as the sentencing date on the remaining two charges. Nothing was said at the time as to whether the life sentence was to run concurrently or consecutively with the sentence defendant was already serving. Shortly after adjoining for the day, defense counsel brought to the attention of the judge that he had failed to so provide. The judge, being informed for the first time that defendant was serving a sentence for parole violation, immediately recalled defendant and informed her that he was reserving judgment on whether the life sentence would be concurrent or consecutive to the sentence for parole violation until he had received the presentence report, and he would render his decision at the May 25 hearing. The judge reasoned that he always had the power to correct an omission provided he did so promptly. Thereafter, on May 25, after reviewing the presentence report, the judge decided to make the life sentence consecutive with the sentence defendant was serving for parole violation.
Defendant contended following trial, and now on this appeal, that because the judge failed to make the murder sentence consecutive at the time it was imposed, it must be presumed to be concurrent. In addition, she claims that given this presumption, *427 to allow the judge to make the sentence consecutive on May 25, even though based upon a review of the presentence report, acted to increase the sentence which, she asserts, is unauthorized by New Jersey law.
When a defendant is convicted of first degree murder a mandatory life sentence under N.J.S.A. 2A:113-4 is imposable without first obtaining a presentence report. Since the sentence is not discretionary, presentence reports required by R. 3:21-2, are not required before sentencing for first degree murder. State v. Robinson, 139 N.J. Super. 58, 64 (1976), certif. den. 75 N.J. 534 (1977).
The general rule is that separate sentences imposed by a single New Jersey court will run concurrently unless the sentencing judge clearly directs that they be served consecutively. See State v. Williams, 29 N.J. Super. 309, 313 (App.Div. 1954), certif. den. 348 U.S. 847, 75 S.Ct. 71, 99 L.Ed. 668 (1954). The same rule applies to the imposition of separate sentences, at separate times, by more than one New Jersey court. See State v. Corbitt, 147 N.J. Super. 195, 199 (Law Div. 1977).
In the situation before us, however, we think the presumption is inapplicable. First, unlike the Williams case, the ambiguity was quickly brought to the attention of the trial judge, who immediately informed defendant, on the same day, that he would postpone deciding the issue of concurrence or consecutiveness of sentence until May 25 when he had reviewed the presentence report. Second, under R. 3:21-5, a judgment of conviction occurs when the judge signs the sentencing order and it is entered by the clerk. As occurred in this case, the trial judge did not enter a "judgment" on May 10 but rather announced the mandated life sentence pursuant to N.J.S.A. 2A:113-4 and postponed the entry of judgment until May 25. In reserving on the question of consecutive or concurrent sentence until receiving a presentence investigation report, the judge was attempting to accomplish justice between the defendant and the State.
*428 Furthermore, we do not find defendant's assertion that the trial judge unlawfully increased the sentence by removing the ambiguity to be very persuasive. Since we have already determined that the presumption of concurrent sentence does not apply to this case, it follows that the ultimate sentence imposed on May 25 did not increase defendant's sentence. Moreover, a number of decisions have concluded that the prohibition against increases in sentences does not apply until a defendant begins serving his sentence. See State v. White, 3 N.J. Misc. 1016, 1017-1018 (Sup.Ct. 1925), aff'd 103 N.J.L. 153 (E. & A. 1926); State v. Ryan, 171 N.J. Super. 427, 435 (App.Div. 1979), certif. granted 82 N.J. 297 (1980). See, also, State v. Matlack, 49 N.J. 491, 501 (1967). Under the common law a judge could not increase or decrease a sentence once it had gone into operation. Since the trial judge was able to correct the ambiguity prior to the defendant leaving the courthouse and before he signed the judgment of conviction, there was no impermissible change in the sentence.
While State v. Pratts, 145 N.J. Super. 79 (App.Div. 1975), aff'd o.b. 71 N.J. 399 (1976), has rejected State v. White, supra, it nonetheless concluded that the trial judge cannot increase a sentence after signing the judgment of conviction except to correct legal or clerical errors. In the instant case no judgment had been signed when the judge imposed the consecutive sentence on May 25. Although the Pratts court limited the period during which the court could conceivably increase a sentence, it does not help the defendant in our case since, unlike Pratts no judgment of conviction was entered before the judge corrected the ambiguity. Furthermore, the judge declined to address the issue of whether a change in sentence before the judgment of conviction is signed is impermissible. Hence we conclude that this contention is, likewise, without merit.
Defendant's final assertion is that the sentence imposed on her was manifestly excessive. She contends that the trial judge should have taken into account her alleged intoxication as well *429 as her young age (25) and the possibility of rehabilitation. Defendant's claim is meritless.
It is clear that the standard to be employed by an appellate court in reviewing the punishment imposed by a sentencing judge precludes intervention unless a clear abuse of discretion has been shown. See State v. Milligan, 71 N.J. 373, 395 (1976); State v. Knight, 72 N.J. 193, 195 (1976). We see absolutely no abuse of discretion in this case. The facts of this case fully support the trial judge's view that the degree of violence exhibited by defendant was quite uncommon. Defendant's presentence report indicates that she has an extensive history of violence and has shown no ability to conform to lawful behavior. The sentences were neither manifestly excessive nor unduly punitive. State v. Whitaker, 79 N.J. 503, 512 (1979).
Affirmed.